The PEOPLE of the State of Colorado, Plaintiff-Appellee,

v.

Russell Eugene FREEMAN, Defendant-Appellant.

No. 82SA178.

Supreme Court of Colorado, En Banc.

Sept. 6, 1983.

Rehearing Denied Sept. 26, 1983.

---

J.D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., Nathan B. Coats, Asst. Atty. Gen., Denver, for plaintiff-appellee.

J. Gregory Walta, Colorado State Public Defender, Michael Heher, Deputy State Public Defender, Denver, for defendant-appellant.

ERICKSON, Chief Justice.

The defendant, Russell Eugene Freeman, appeals from his convictions on two counts of first-degree murder after deliberation, section 18–3–102(1)(a), C.R.S.1973 (1978 Repl.Vol. 8), and two counts of felony murder, section 18–3–102(1)(b), C.R.S.1973 (1978 Repl.Vol. 8), all arising from the robbery-murders of Steven Tackett and Susan Williams.[1] Freeman claims error in the trial court's refusal to suppress his confession, asserting that it was the fruit of an illegal arrest and was given involuntarily and without proper *Miranda* warnings. He also challenges venue with respect to the Williams murder, the district court's refusal to compel an election between the murder after deliberation and the felony murder counts, the imposition of consecutive sentences for two of the murder convictions, and a number of the district court's evidentiary rulings and instructions to the jury. We reverse and remand for a new trial.

## I.

On July 13, 1979, the defendant and his step-brother, Fred Morris, sold a Chevrolet Malibu registered in the name of Steven Daniel Tackett to officers of the Lakewood Department of Public Safety, who were purchasing stolen goods as part of an undercover fencing operation. Freeman had sold automobiles to the operation on two prior occasions, and during one transaction he described to the officers how he had obtained the vehicle by kidnapping its owner at gunpoint.[2] He also displayed a .45 caliber semi-automatic handgun to the offi-

cers, who observed and recorded its serial number.

The defendant made a fourth sale of a Chevrolet Monte Carlo to the police on July 16. That evening, the officers learned that Tackett's decomposed body had been discovered at Molholm Elementary School, just two blocks from the undercover "sting" operation site. A spent .45 caliber shell casing was found near the victim, and the pathologist performing the autopsy indicated that Tackett had been killed by a large caliber gunshot wound to the head, with entry and exit wounds consistent in diameter with a .45 caliber bullet. The pathologist estimated the time of death as at least forty-eight hours prior to the discovery of the body. The officers also learned that the registered owner of the stolen Monte Carlo, Susan Rae Williams, had recently been reported as missing.

On July 17 at approximately 11:45 p.m., Freeman telephoned the Lakewood officers and made arrangements for the sale of yet another vehicle. The officers immediately called a meeting where they described the defendant and made plans to arrest him and anyone accompanying him to the sale, which was scheduled to take place at 1:00 a.m. on July 18. The defendant and Fred Morris were observed driving separate cars toward the undercover site at approximately 1:00 a.m., and Morris was stopped and arrested near the site; the .45 caliber pistol which the defendant had earlier displayed to the officers was recovered from the car. The defendant refused to stop, however, and led the officers, along with officers from a number of other jurisdictions, on a high speed chase. The chase ended when the defendant abandoned his car and fled into the fields near 136th Avenue and Huron Street in Adams County.

A search of the area was conducted but the officers were unable to locate the de-

1. The defendant's appeal was transferred to this court because of the constitutional claims raised by him. *See* sections 13–4–102(1) & 13–4–110(1)(a), C.R.S.1973.

2. This transaction and other sales made by the defendant were recorded on videotape by a hidden camera at the undercover site. Dolores Luckert, the victim of the kidnapping described by the defendant, was able to escape only by leaping from the moving vehicle.

fendant, and they left the area at 7:00 a.m. Broomfield police officers participating in the search then met to critique the investigation, but were interrupted at 7:53 by a report from the Adams County Sheriff's office that a black male matching the defendant's description was seen in the vicinity of the search area. The dispatcher also reported that the suspect was believed to have been involved in the previous night's search, and was suspected of auto theft and a possible homicide. As he was driving on Interstate 25 toward 136th Avenue, Broomfield Officer Robert Shephard saw a hitchhiker along the highway near the search area and, after calling him over to his car and determining that he matched the description of the defendant, arrested him.

The defendant was driven to the Broomfield Police Department where he was held for approximately two hours. He was then driven to Lakewood and at about 1:00 p.m. was interviewed by the Lakewood officers for approximately two hours. The officers informed the defendant that they were interested in questioning him about the previous night's automobile chase, and advised him that he need not answer any questions and that he had the right to have an attorney present. Freeman agreed to talk to the officers and tell them "what happened last night," and initially denied any involvement in the chase.[3] He also denied participation in any automobile thefts. During one point in the interrogation one of the undercover officers to whom the defendant had made sales of stolen vehicles entered the room. The officers then attempted to employ a version of the "Mutt and Jeff" routine, with several officers acting in a belligerent and accusatorial fashion toward the defendant while another acted as his sympathetic friend.

When pressed, the defendant admitted to the theft and sale of several automobiles, including Tackett's Malibu and Williams'

Monte Carlo. The questioning then focused specifically upon the Tackett murder. The officers accused the defendant of the crime and told him that they knew his gun was the murder weapon. In fact, no testing of the weapon had yet been performed. On numerous occasions the officers referred to Fred Morris' involvement in the crimes and indicated that he would face murder charges "unless somebody else has got enough guts to stand up and say what really happened." They indicated that Morris "didn't want to go back to prison," and falsely stated that he had implicated the defendant in Tackett's murder. The officers also appealed to the defendant's sympathy for Susan Williams' family, stating "they know she is dead. They want to find her, can you show us where she is . . . . It doesn't make any difference to you at all other than—you know maybe it would be a good thing." The defendant responded, "yeah, get time in the can," to which an officer replied, "for one or ten—it doesn't make any difference—you know that as well as I do. If you do one stickup, if you do ten stickups, you get the same time."

When he was assured that he would be allowed to see his girlfriend after he revealed the location of Williams' body, Freeman stated, "I'll take you to the body." Thereafter, he admitted to the shooting of Tackett after encountering him in downtown Denver, forcing him into his own car, and driving to Molholm School. Freeman also admitted that he and his brother, Harry, encountered Susan Williams as she was leaving a Denver nightclub, forced her into her automobile, and drove her to a field where he stabbed her and tried to cut her throat. When the defendant expressed concern regarding the length of the sentence which he could receive, an officer reassured him by stating that a person convicted of murdering even a famous person like Coors actually serves little time in prison. The defendant later stated, "its hard to run it

---

**3.** The interview was recorded and transcribed. Quotations within the opinion are from the transcribed interview.

all together," to which the officer responded, "Oh, that's just going to be on paper—that's all its gonna be—they don't stack 'em up. If you get five here and ten there and ten more someplace else—they'll run them all together." Freeman then described how he eluded capture following the automobile chase and drew a map for the officers indicating the location of Williams' body, which was recovered. The autopsy indicated that Williams died as the result of multiple stab wounds to the chest, and a superficial incisional wound was discovered on her neck.

The defendant was charged in Jefferson County District Court with the murders of Tackett and Williams—two counts of murder after deliberation and two counts of felony murder. An additional charge of theft by receiving was severed from the murder charges. His *pro se* motion to suppress statements and physical evidence was denied by the trial court after a hearing, and he was subsequently convicted of both murders. The court entered judgment and sentenced the defendant to life imprisonment on all four murder counts, ordered the premeditated and felony murder convictions for each victim to run concurrently, and ordered the sentences for the murder of Tackett to run consecutively to those for the murder of Williams.

## II.

The defendant claims that his statements to the Lakewood officers should not have been admitted into evidence because they were the fruit of an arrest made without probable cause. His claim is not supported by the record.

▪ Probable cause to arrest exists when the objective facts and circumstances available to a reasonably cautious officer warrant the belief that an offense has been or is being committed by the person arrested. *People v. Hazelhurst,* 662 P.2d 1081 (Colo.1983); *People v. Chavez,* 632 P.2d 574 (Colo.1981). An officer who does not personally possess sufficient information to constitute probable cause may nevertheless make a valid arrest if he acts upon the direction or as a result of a communication from a fellow officer, and the police, as a whole, possess sufficient information to constitute probable cause. *People v. Baca,* 198 Colo. 399, 600 P.2d 770 (1979); *People v. Nanes,* 174 Colo. 294, 483 P.2d 958 (1971).

At the suppression hearing, Officer Shephard testified that he was dispatched to the search area in response to a call for assistance from the Adams County Sheriff's office. Shephard had received a description of the defendant at the Broomfield critique session and again by the Adams County dispatcher, which included the facts that the defendant was a black male; he had an indentation on his chin; he wore his hair in tightly braided "corn rows"; and he was last seen wearing blue jeans, tennis shoes, and a dark jacket. Observing a black male hitchhiking approximately one mile from the search area, Shephard stopped and called him over to the patrol car. As the suspect approached the car, Shephard specifically observed his tightly braided hair and an indentation on his chin. He also noted that the suspect's blue jeans and tennis shoes were wet and covered with mud, and that he was carrying a dark jacket. After determining that the suspect in fact matched the defendant's description, Shephard placed him under arrest.

▪ We conclude that although Officer Shephard may not have possessed personal knowledge sufficient to constitute probable cause to arrest, he was acting pursuant to the direction of a fellow officer—the Adams County dispatcher. In addition, on the basis of the defendant's prior activities, including his video taped transactions with Lakewood officers and the automobile chase and search which ultimately involved officers from a number of police agencies, the police as a whole possessed sufficient information to constitute probable cause to arrest the defendant.

When Officer Shephard observed a black male matching the defendant's general de-

scription within one mile of the search area and less than one hour after the police had left that area, he was justified in delaying the suspect long enough to get a closer look at him. *People v. Smith,* 620 P.2d 232 (Colo.1980); *People v. Chavez, supra.* When Shephard further observed the defendant's highly distinctive identifying features and determined that he matched the description given to him by other officers, Shephard then justifiably arrested him. The defendant's contention to the contrary is without merit.

Our conclusion that the arrest was constitutional and valid under the exigent circumstances of this case where Shepard was acting at the request of the Adams County Sheriff, precludes consideration of Freemen's additional claim that his statements should be suppressed as fruit of an arrest by a police officer outside his jurisdiction. *Cf. People v. Wolf,* 635 P.2d 213 (Colo.1981) (Denver police illegally arrested defendant in Adams County; statements made pursuant to arrest admissible).

### III.

The defendant also asserts that the trial court erroneously refused to suppress his statements to the Lakewood officers because they were given involuntarily and without a proper *Miranda* warning. We agree that the confession was involuntary and therefore do not address his *Miranda* challenges.

### A.

■ A defendant's confession is admissible only if it is voluntary. *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); *People v. Fordyce,* 200 Colo. 153, 612 P.2d 1131 (1980). His statements must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. *Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); *People v. Quintana,*

198 Colo. 461, 601 P.2d 350 (1979); *People v. Scott,* 198 Colo. 371, 600 P.2d 68 (1979).

■ The determination of whether a statement is voluntary must be based upon the totality of the circumstances, and among the relevant factors to be considered are the occurrences and events surrounding the confession, including the presence or absence of official misconduct. *People v. Raffaelli,* 647 P.2d 230 (Colo.1982); *People v. Quintana, supra.* On review, we are bound by the trial court's factual findings when they are supported by adequate evidence in the record, *Gimmy v. People,* 645 P.2d 262 (Colo.1982), and we will not lightly disturb the court's findings with respect to the voluntariness of a defendant's statements. However, we cannot ignore uncontradicted and credible evidence in the record that is contrary to the court's decision.

The rule requiring the exclusion of involuntary confessions has its source in the due process clauses of the United States and Colorado Constitutions. *Jackson v. Denno, supra; Colo. Const.* art. II, § 25. Although involuntary confessions were historically excluded because they were believed to be unreliable, that rationale is no longer the sole reason for exclusion. In *People v. Raffaelli, supra,* we stated:

"Involuntary statements are excluded from evidence 'not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth.' "

647 P.2d at 235 (footnote omitted) (quoting *Rogers v. Richmond,* 365 U.S. 534, 541, 81 S.Ct. 735, 739, 5 L.Ed.2d 760, 766 (1961)).

### B.

Applying the totality of the circumstances test to Freeman's confession, the trial

court found that although various tactics were employed against the defendant, the confession was nevertheless given voluntarily. The court based its decision on the fact that there was no prolonged interrogation, no threats or physical coercion, and no direct promises made to the defendant. From a careful examination of the entire record, we conclude that the finding of voluntariness is not supported by the evidence.

The trial court recognized that the officers employed the tactic of suggesting that Fred Morris would face serious charges unless cleared by the defendant. Throughout much of the interrogation the defendant exhibited concern for his step-brother's welfare, expressing on several occasions his desire not to involve Morris "in this mess." On another occasion Freeman indicated that he was taking the "rap" for the offenses and stated, "that's the way I want it, because I don't want my brother man—because he's older and he's still got some life, he spent half of his life in the penitentiary." Additionally, in response to appeals for sympathy for Susan Williams' family, the defendant stated, "yeah, I've got a family to help too—for the first time." He later confessed to both murders after stating, "turn my brother Fred loose," and attempted thereafter to exculpate Morris both during the interview and again at the arraignment.

■ Psychological as well as physical pressures may be brought to bear on a suspect to induce his confession, and under some circumstances may render it involuntary. *See Blackburn v. Alabama,* 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1961) (confession held involuntary upon evidence of defendant's mental incompetence, sustained interrogation in a small room, absence of defendant's relatives or legal counsel, and confession composed by deputy sheriff rather than defendant). Threats of filing criminal charges against family members may also bear on whether a confession is voluntary. *See, e.g., Rogers v. Richmond, supra; cf. Lynumn v. Illinois,* 372 U.S. 528, 83 S.Ct.

917, 9 L.Ed.2d 922 (1963). While the officers here had reason to suspect Fred Morris of involvement in criminal activity, their statements to the defendant regarding charges Morris might face unless cleared, and the defendant's reactions to these statements, are important factors which bear on the voluntary nature of the confession.

■ Moreover, the officers attempted to minimize the seriousness and the extent of the defendant's criminal liability by suggesting that he would face no adverse consequences by revealing the location of Williams' body and by assuring him that he would receive the same punishment regardless of the number of offenses he actually committed. Although these assurances may not rise to the level of direct promises to the defendant, they are weighty factors to be considered within the totality of the circumstances and were not adequately dealt with in the trial court's findings.

In addition to those circumstances, the officers employed a version of the "Mutt and Jeff" routine that was condemned in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). One officer who had purchased stolen vehicles from the defendant frequently berated him, accused him of the murders, and reacted with angry disbelief when the defendant denied his guilt. Another detective intermittently reassured and complimented the defendant, stating on several occasions how "tough" and "street smart" the defendant was and how he sympathized with the defendant's personal and legal problems.

■ During one point in the interrogation the defendant expressed a desire to speak with his girlfriend, and the officers promised to allow him to do so after he revealed the location of Williams' body. The officers also told the defendant that his girlfriend would not have to pay for the release of her automobile, which had been driven by the defendant during the automobile chase and impounded by the police, when no impoundment charges could be

made. The officers' false representations regarding the extent of their knowledge and evidence of the defendant's participation in the murders, coupled with their assertions of defendant's obvious guilt, added to the coercive nature of the interrogation. *See Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); *State v. Allies,* 606 P.2d 1043 (Mont.1980).

■ None of these factors, considered separately, render the confession involuntary; they merely must be considered within the totality of the circumstances. We conclude, however, that the coercive atmosphere surrounding this particular interrogation, coupled with the factors set out in this opinion, caused the defendant's confession to be involuntary. Accordingly, the confession should have been suppressed.[4]

## IV.

Since this case must be remanded for a new trial, we address the additional claims of error that will likely be raised on retrial.

## A.

The defendant claims that Jefferson County was not a proper venue for trial on the murder charges relating to the death of Susan Williams because her actual kidnapping and murder took place entirely in Denver County. We find no error.

■ A proper venue for trial lies in the county where the offense was committed, or in any other county where an act in furtherance of the offense occurred. Section 18–1–202(1), C.R.S.1973 (1978 Repl.Vol. 8); *see also* Crim.P. 18(a)(1). Venue must be properly established and when raised

becomes an issue to be determined in the same manner as any other issue in the case. *People v. Gould,* 193 Colo. 176, 563 P.2d 945 (1977); *Tate v. People,* 125 Colo. 527, 247 P.2d 665 (1952).

Evidence presented by the prosecution at trial established that Williams was kidnapped by the defendant in the early morning hours of July 15 from a location in Denver County, and was driven in her own car to a different location in Denver County where she was murdered and where her body was found. The defendant then attempted to contact the undercover officers in order to sell her automobile, but was unable to reach them until about 12:30 that afternoon. The officers delayed the sale until the following morning, and the defendant informed them that he had a place to conceal the vehicle until that time. At approximately 8:15 a.m. on July 16, the defendant arrived at the undercover site, located in Jefferson County, and sold Williams' vehicle to the officers.

■ The subsequent sale of stolen property does not necessarily constitute an act in furtherance of that robbery. However, in this case, the sale of the vehicle was closely related to the defendant's common scheme to obtain and sell vehicles by means of robbery and murder. In such a case where the sale was clearly in the defendant's mind prior to the commission of the murder and was the motivating factor for the robbery and murder,[5] and where the disposition of the vehicle was, in part, an act to conceal his participation in these offenses and actually took place in Jefferson County, there is sufficient evidence to tie the defendant to an act in furtherance of the offense in Jefferson County. *Cf. Peo-*

4. At the time of retrial, it will be necessary to determine how the evidence was derived from the co-defendant. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *People v. Founds,* 621 P.2d 325 (Colo. 1981).

5. The defendant's motivations are evidenced by the prior sales to the officers and the close proximity in time between the commission of

the murder and the attempts to contact the undercover operation. In addition, one of the undercover officers testified that three days before selling Williams' automobile the defendant appeared to sell Tackett's vehicle, and was disappointed by the amount of money he received. At that time he indicated that he would have to do better next time and would "just get another car."

*ple v. Gould,* 563 P.2d at 946 (where a face-to-face transaction is committed in Denver and no part is carried out in Jefferson County, there is nothing to tie the defendant to an act in furtherance in Jefferson County). The Jefferson County venue was therefore proper.

## B.

The defendant was charged in four counts with the murders after deliberation and the felony murders of Tackett and Williams. At trial, he filed a motion to compel the prosecution to elect which count it would submit to the jury with respect to each victim. The motion was denied and the defendant was convicted and sentenced on all four counts. On appeal, Freeman again claims that he is entitled to have the prosecutor elect between the murder counts as he requested.

In *People v. Lowe,* 660 P.2d 1261 (Colo. 1983), we declared that the prosecution should be allowed to charge multiple theories of first-degree murder in separate counts, and it may, but should not be required to, elect among theories after the evidence is closed. *See also* section 18–1–408(3), C.R.S.1973 (1978 Repl.Vol. 8). Applying the rule of lenity, however, we held that only one judgment of conviction and one punishment can be imposed for one first-degree murder, because multiple convictions for a single killing would result in enhanced collateral punishment. *People v. Lowe, supra; see also People v. Bartowsheski,* 661 P.2d 235 (1983).

We conclude therefore that although the denial of the defendant's motion to compel an election is not error, dual convictions and sentences may not be entered on the murder after deliberation and felony murder counts with respect to each killing. The proper procedure to be followed on remand is as we stated in *Lowe:*

"If there is sufficient evidence in the record, all theories charged should be submitted to the jury for a special verdict. The jury should be informed that the defendant is charged with one crime, first-degree murder. The jury's special verdict should indicate which theories of first-degree murder, if any, have been proved by the evidence." 660 P.2d at 1271.

## C.

The defendant also claims error in a number of evidentiary rulings made by the trial court, including challenges to the admission of various motor vehicle records, video tapes, finger print records, license plates, and allegedly hearsay statements. We conclude the evidence was properly admitted.

The trial court admitted various motor vehicle records relating to the automobiles and drivers' licenses of the two victims. The defendant claims these records lacked a proper foundation insofar as the certificates accompanying them contained machine-generated signatures of the executive director of the motor vehicles department. We need not consider whether a facsimile signature constitutes proper attestation to self-authenticate motor vehicle records, *see* section 42–2–118, C.R.S.1973 (1980 Supp.), because in this instance the records were properly identified by a qualified witness.

We agree with the prosecution that while section 42–2–118 provides one specific method to self-authenticate motor vehicle records, it does not alter the rule that official records may also be proved by any method authorized by law. *See* Crim.P. 27; C.R.C.P. 44(c); *People v. Rivera,* 37 Colo.App. 4, 542 P.2d 90 (1975). The exhibits in this case were all identified by James Shaw, who testified that he was the official custodian of the records.[6] Shaw also testified to his personal knowledge of record searches which revealed that no oth-

---

6. The certificate accompanying the records also acknowledged that Shaw was "charged with the custody and control of the said records."

**1382**

er records in his department bore the same names as those appearing on the exhibits. The records were therefore sufficiently authenticated by an individual officially charged with their custody, and no further foundation was required. *Raullerson v. People*, 159 Colo. 395, 412 P.2d 236 (1966).

▇ The defendant also asserts error in the admission of video tapes of sales of automobiles made by him to the undercover fencing operation. The tapes depict the sale of both of the victims' vehicles, as well as the sale of a vehicle owned by Dolores Luckert, who was assaulted and robbed of her automobile by the defendant only days before the murders. Certain portions of the tapes were excised by the trial court, and limiting instructions were given to the jury. The defendant nevertheless claims that allowing the jury to view the tapes was prejudicial error because they contained references by him to collateral misconduct. We disagree.

In *People v. Jackson*, 627 P.2d 741 (Colo. 1981), we declared that evidence of other crimes that occur as part of the *res gestae* of the offense is admissible so long as it is relevant and its probative value is not substantially outweighed by the probability of unfair prejudice to the accused. The transactions depicted in this case were all related to the defendant's common scheme to sell automobiles to the undercover operation after obtaining them by means of robbery and murder, and were part of the *res gestae*. The tapes were also relevant to the issue of the defendant's guilt in relation to the robberies underlying the felony murder charges. While the tapes contained several references to collateral misconduct that was not directly relevant to the offenses, the evidence was probative in lending understanding and credibility to the transactions in their entirety. The probative value of the evidence was not substantially outweighed by the probability of unfair prejudice to the defendant. The tapes were therefore properly admitted.

We have considered the defendant's remaining evidentiary claims and find them to be without merit. We therefore do not address them.

**D.**

The defendant has also challenged several of the instructions given to the jury.

▇ The jury was instructed on the elements of murder after deliberation and felony murder in which the underlying felony was robbery or attempted robbery. In a separate definitional instruction the court defined "intentionally," the culpable mental state for murder after deliberation, as follows:

"A person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense, when his conscious object is to cause that result or to engage in that conduct *or when his actions are such as to give rise to a substantial certainty that such results will be produced.*"

(Emphasis added.) The instruction defining "knowingly," the culpable mental state for robbery, stated:

"A person acts 'knowingly' with respect to conduct or to a circumstance described by a statute defining an offense when he is aware, *or reasonably should be aware,* that his conduct is of that nature or that the circumstance exists."

(Emphasis added.) No objections to either of these instructions were raised at trial or in the defendant's motion for new trial. However, when plain error appears in the record, we should consider it even though it is first raised on appeal. *People v. Hardin*, 199 Colo. 229, 607 P.2d 1291 (1980); Crim.P. 52(b). The defendant claims these instructions constitute plain error because they significantly reduce the culpable mental state required for each offense. We agree.

▇ The trial court has the duty to instruct the jury properly on all matters of law, and the failure to do so with respect to the essential elements of the offense constitutes plain error. *People v. Hardin, supra;*

*People v. Archuleta,* 180 Colo. 156, 503 P.2d 346 (1972). The definitional instructions in this case were based on statutory definitions that were amended in 1975 to delete the emphasized portions. *See* Colo.Sess. Laws 1975, ch. 167, at 616. The statute now provides that a person acts intentionally "when his conscious objective is to cause the specific result proscribed by the statute defining the offense." Section 18–1–501(5), C.R.S.1973 (1978 Repl.Vol. 8). That part of the definition of "knowingly" now states, "a person acts 'knowingly' or 'willfully' with respect to a result of his conduct, when he is aware that his conduct is practically certain to cause the result." Section 18–1–501(6), C.R.S.1973 (1978 Repl.Vol. 8).

■ As instructed, the jury was permitted to find that the defendant acted intentionally on the basis of his actions alone, rather than on the precise "conscious objective" standard required by statute. Likewise, the court's definition of "knowingly" permitted a finding, not on the defendant's guilty knowledge, but rather on a basis that amounts to a negligence standard. *See People v. Quick,* 190 Colo. 171, 544 P.2d 629 (1976); *People v. Etchells,* 646 P.2d 950 (Colo.App.1982). The instructions were thereby fundamentally flawed because they permitted a verdict of guilty to be returned upon a lesser degree of culpability than is required by the statute. *People v. Mingo,* 181 Colo. 390, 509 P.2d 800 (1973).

■ We also agree that the trial court erroneously removed the culpable mental state of "intentionally" from its instruction on criminal attempt, which is among the elements of felony murder. At trial, the court noted that the General Assembly deleted "intentionally" from the criminal attempt statute, *see* Colo.Sess.Laws 1977, ch. 224, at 960, and ruled that the term therefore should be excluded from the instruction.

In *People v. Frysig,* 628 P.2d 1004 (Colo. 1981), which was decided after the court's ruling, we held that the deletion of "inten-tionally" from the criminal attempt statute was not intended to change the traditional rule that the intent to commit the underlying offense is one of the elements of criminal attempt. The deletion was designed to change certain crimes from specific intent to general intent offenses so that intoxication could not be used to negate the element of specific intent. Since the court here did not define the term "substantial step," which we held conveys the equivalent of the common meaning of "intent," 628 P.2d at 1010, the removal of "intentionally" from the criminal attempt instruction was erroneous.

■ The defendant also challenges the instruction on "specific intent," which was given in relation to the murder after deliberation charges. The instruction stated:

"Specific intent is a state of mind voluntarily and willfully to do or perform an act which will effect a certain result. Such an act must not be the result of accident or other innocent reason. The defendant's conscious objective must be to cause a certain result. It is immaterial to the issue of specific intent whether or not the result actually occurred."

The defendant claims that this instruction is internally inconsistent and has the effect of lessening the culpable mental state to be proved by the prosecution. We rejected a similar challenge to that language in *People v. Mack,* 638 P.2d 257 (Colo.1981), and held that, considered as a whole, the instruction conveys the essential meaning of specific intent. The defendant's claim to the contrary is without merit.

■ We also reject the defendant's claim that the failure to restate the term "knowingly" before each of the enumerated elements in the robbery instruction relieved the prosecution of its burden of proof with respect to those elements. The instruction, which was framed in the statutory language and which specifies prior to the enumeration that a person commits robbery if "he knowingly takes anything of value from the person or presence of another by the use of force, threats, or intimidation,"

sufficiently specifies the essential elements of robbery and adequately informs the jury of the applicable law. *Blincoe v. People,* 178 Colo. 34, 494 P.2d 1285 (1972).

Finally, we conclude that the failure of the trial court to define *sua sponte* the term "substantial step" in the criminal attempt instruction was not plain error. Additionally, we conclude that the instruction on complicity, which did not inform the jury that it must unanimously agree on the same acts of aiding and abetting, did not constitute prejudicial error in this case. *People v. Glenn,* 200 Colo. 416, 615 P.2d 700 (1980).

### E.

The defendant also claims that the trial court erred in ordering the life sentences imposed for the Tackett murder to run consecutively with those imposed for the Williams murder. Insofar as a new trial is required by our disposition of this case which may result in different convictions and sentences, *see People v. Lowe, supra; People v. Bartowsheski, supra,* our examination of the defendant's claim is unnecessary.

The defendant's conviction is reversed and the case is remanded for a new trial consistent with the directions contained in this opinion.