The PEOPLE of the State of Colorado,
Plaintiff-Appellant,

v.

Nancy Lynn PEARSON,
Defendant-Appellee.

No. 85SA275.

Supreme Court of Colorado,
En Banc.

Sept. 29, 1986.

Doyle T. Johns, Jr., Dist. Atty., Mark L. Miner, Deputy Dist. Atty., Fort Morgan, for plaintiff-appellant.

David F. Vela, Public Defender, William Sublette, Deputy Public Defender, Sterling, for defendant-appellee.

KIRSHBAUM, Justice.

In this interlocutory appeal pursuant to C.A.R. 4.1, the People challenge an order of the Morgan County District Court suppressing a custodial statement made by the defendant, Nancy Pearson, to a deputy sheriff in connection with the September 15, 1984, shooting death of her husband, John Pearson, Jr. The trial court concluded that the defendant's statement was involuntary. We vacate the district court's order and remand the case with directions for further proceedings.

The defendant is charged with the offense of manslaughter, in violation of section 18–3–104, 8 C.R.S. (1978). Testimony during the suppression hearing established that in the late evening of September 15, 1984, the defendant went to the home of Wayne Beers, a neighbor, told him her husband had just been shot, and asked for help from Beers and his son. While Beers' son called for assistance, the defendant and Beers went to the defendant's home. They found the defendant's husband lying on the floor. As the defendant lifted her hus-

band's head onto her lap and asked him to talk, Beers told her that he could not find any pulse. The defendant then ran back to the Beers' residence to telephone for more assistance.

Shortly after 11:00 p.m., Morgan County Deputy Sheriff Lorenzo Villarreal arrived at the defendant's home and discovered the victim. Villarreal then went to the Beers' residence and told the defendant that he needed to talk to her. At the suppression hearing Villarreal testified that at that time the defendant was crying, that she smelled of alcohol, that he advised her of her *Miranda* rights, and that he then placed her in the custody of Deputy Sheriff Don Wood for transportation to a hospital where various tests could be conducted. Wood testified at the hearing that he asked the defendant if she had understood the rights read to her by Villarreal and if she would talk to Wood, that the defendant indicated she understood her rights, and that the defendant said she was willing to discuss that evening's events.

Wood testified that during the trip to the hospital the defendant was at times crying and somewhat hysterical, but that she nevertheless discussed the events surrounding the shooting and asked about her husband's condition. At the hospital the defendant was treated for minor injuries and was given a blood alcohol test. Wood testified that her blood alcohol level was 0.116 percent. Wood also testified that as they were leaving the hospital he told the defendant that her husband was dead, and that the defendant then fainted.

The defendant was revived, and she and Wood drove to the Morgan County Sheriff's Office. The defendant was then interrogated for approximately one hour and twenty minutes. The session was tape-recorded, and the transcript indicates that at times the defendant cried. The trial court concluded that the defendant's statements to Wood en route to the hospital were admissible, but that her statements at the sheriff's office were involuntary and, therefore, inadmissible.

A custodial statement by an accused, if freely and voluntarily made, is admissible as evidence against the accused at trial. *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *People v. Fish,* 660 P.2d 505 (Colo.1983); *see Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). The test of voluntariness generally applied by both federal and state courts is whether the challenged statement was the product of a rational intellect and a free will, unaffected by improper influence, coercion, threats or promises. *See, e.g., Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); *People v. Smith,* 716 P.2d 1115 (Colo.1986); *People v. Raffaelli,* 647 P.2d 230 (Colo.1982); *People v. Parada,* 188 Colo.230, 533 P.2d 1121 (1975). The prosecution bears the burden of establishing the voluntariness of an accused's custodial statement by a preponderance of the evidence. *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618; *People v. Raffaelli,* 647 P.2d 230.

In determining the issue of voluntariness, a trial court must assess the totality of the circumstances under which the statement was given. *Haynes v. Washington,* 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); *People v. Freeman,* 668 P.2d 1371 (Colo.1983). Relevant circumstances include the atmosphere and events surrounding the elicitation of the statement, such as the use of violence, threats, promises, improper influence or official misconduct, *People v. Freeman,* 668 P.2d 1371, the conduct of the defendant before and during the interrogation and the defendant's mental condition at the time the statement is made. *People v. Raffaelli,* 647 P.2d 230. No single factor is necessarily controlling.

The trial court's order suppressing the statements made by the defendant at the sheriff's office was based primarily, if not exclusively, upon its finding that the defendant was quite emotionally upset during

that interrogation.[1] This determination was made prior to the announcement of our decision in *People v. Smith*, 716 P.2d 1115 (Colo.1986). We there held that an accused's emotional distress after learning of the death of the victim is not in itself a sufficient basis for the conclusion that the accused's statement is involuntary. It appears, therefore, that the trial court applied an erroneous standard in arriving at its ultimate determination.

■ In some circumstances, we might apply the appropriate legal standard to the findings heretofore made by the trial court and resolve the legal question at this juncture. However, the record contains diverse evidence introduced by both parties concerning events and conditions surrounding the defendant's communications to sheriff officials at various points in time. Indeed, the trial court did not find that the circumstances surrounding the defendant's ride to the hospital required suppression of the statement she made to Wood during that ride. Given this state of the record, we conclude that the case should be remanded to the trial court with directions to enter amended findings of fact in support of whatever conclusion it ultimately reaches in view of our decision in *Smith*. The trial court may conduct such further proceedings as it deems appropriate to enable it to make such findings and conclusions.

The trial court's order is vacated and the case is remanded for further proceedings consistent with the views expressed in this opinion.

QUINN, C.J., dissents.

DUBOFSKY and LOHR, JJ., join in the dissent.

QUINN, Chief Justice, dissenting:

I dissent. In suppressing the defendant's confession, the trial court closely scrutinized the evidence before it, made extensive findings of fact supported by adequate evidence, and applied the correct legal standard to the facts. Since the trial court's suppression order is not clearly erroneous, there is no warrant for this court's vacation of that order. Nonetheless, the majority sets aside the suppression ruling on the basis of *People v. Smith*, 716 P.2d 1115 (Colo.1986), as if that case created a new standard for evaluating the voluntariness of a confession, when in fact *Smith* involved nothing more than an application of long-standing principles of law to the evidentiary state of the record. In my view, the court today reaches a result that is fundamentally flawed.

I.

The majority ignores many salient facts in its narrative statement of the events leading up to the defendant's custodial statement to Officer Wood. The record shows that the defendant was verbally and physically abused by her husband while at home earlier in the evening and that the shooting occurred when her husband threatened to kill her if she did not give him a pistol which she had previously removed from a cupboard in the home. During the trip to the hospital with Officer Wood, the defendant was continually crying and somewhat hysterical and asked the officer several times whether her husband was all right. Upon arriving at the hospital the defendant was not only administered a blood alcohol test but also received treatment for a bump on the head, a cut with some dried blood, and some black marks which she had received in a fight with her husband that evening. While in the hospital, the defendant was told that her husband was going to be all right. It was not until she was leaving the hospital that Officer Wood told her that her husband was dead. Upon receiving this information the defendant fainted and fell to the floor. Officer Wood revived her and

---

1. Although the trial court also mentioned the short period of time elapsing between the defendant's fainting spell and the tape-recorded interrogation, as well as the defendant's repeated requests to speak with her mother, as factors rendering the tape-recorded statement involuntary, both of those factors pertain to the defendant's emotional state at the time of the tape-recorded statement.

then drove her to the sheriff's office for a tape-recorded interview.

The tape-recorded interview commenced at 12:55 a.m. on September 16, 1984, with Officer Wood stating as follows:

O.K. Nancy, what I want to do is go through this whole thing as to what happened. More or less I need to get some background from you. You've been advised of your rights o.k. You still want to talk to me? I know you're upset, o.k. I know that you're hurting inside. But I need to talk to you if you're willing to talk to me o.k.

The transcript of the interrogation indicates that the defendant was crying at this time and requested three times to make a telephone call to her mother in order to determine what she should do. After stating that he would call the defendant's mother momentarily, Officer Wood then directed a series of questions to the defendant about the events surrounding the shooting and continued the interrogation for one hour and twenty minutes, with the defendant crying throughout the questioning. At no time either before or during the interrogation was the defendant afforded the opportunity to speak to her mother or, for that matter, to her brother, as she had requested approximately midway through the interrogation.

The majority also makes no mention of the defendant's testimony at the suppression hearing. The defendant testified that she did not recall much of what transpired on the evening of the shooting. Recounting that during her marriage her husband would beat her if she didn't do what she was told and that she was accustomed to doing what other people told her to do, she stated that she did not understand that she had a right not to answer Officer Wood's questions during the interrogation at the sheriff's office. According to the defendant, Officer Wood "[k]ept asking questions and I answered" and that "every time I wanted to call someone it was after we got done that I could call, and I answered the questions when they asked."

## II.

Basic and long-accepted principles governing the admissibility of confession should control the resolution of this case. For a custodial statement to be admissible into evidence against an accused at trial, the prosecution must establish by a preponderance of the evidence that the statement is voluntary. *E.g., Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *People v. Fish,* 660 P.2d 505 (Colo. 1983); *People v. Smith,* 179 Colo. 413, 500 P.2d 1177 (1972). This procedure is designed "to safeguard the right of an individual, entirely apart from [her] guilt or innocence, not to be compelled to condemn [herself] by [her] own utterances." *Lego,* 404 U.S. at 485, 92 S.Ct. at 624, 625. In determining whether the prosecution has met its burden of establishing voluntariness by a preponderance of the evidence, a trial court must assess the totality of circumstances under which the statement was given. *E.g., Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961) (Frankfurter, J., opinion announcing judgment of court); *Blackburn v. Alabama,* 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960); *People v. Freeman,* 668 P.2d 1371 (Colo. 1983); *People v. Raffaelli,* 647 P.2d 230 (Colo.1982). Since the ultimate test of voluntariness is whether a custodial statement is the product of a rational intellect and a free will, a trial court obviously must take into consideration the mental and emotional condition of the accused prior to and during the interrogation. *E.g., Townsend,* 372 U.S. at 307–09, 83 S.Ct. at 754, 755; *Culombe,* 367 U.S. at 603, 81 S.Ct. at 1880, 1881; *Blackburn,* 361 U.S. at 206, 80 S.Ct. at 279, 280; *Raffaelli,* 647 P.2d at 235–36. The range of inquiry in a suppression hearing is necessarily broad, however, and no one factor is dispositive.

I believe the majority misinterprets the trial court's suppression order when it states that it "was based primarily, if not exclusively, upon its finding that the defendant was quite emotionally upset during

[the] interrogation" at the sheriff's office. Majority opinion at 783. While the trial court expressly found that the defendant's consumption of alcohol earlier in the evening had not impaired her ability to understand what was taking place and that the officers displayed a sympathetic attitude toward her, it balanced against these factors not only the defendant's distraught emotional condition throughout the entire evening but also the short time span between the shooting and the tape-recorded interview and, as well, the defendant's repeated but ignored requests to make a telephone call to her mother in order to determine what she should do. Simply put, the trial court did nothing less than weigh the totality of circumstances in resolving the suppression motion in this case. The fact that the trial court might have chosen to accord a greater weight to the defendant's emotional condition than other factors is no reason to invalidate the suppression order. Evidence-weighing decisions of that type are at the very core of a trial court's fact-finding role in a suppression hearing, especially where, as here, the issue before the court was whether the confession was the product of a rational and unconstrained choice of the accused.

The role of a reviewing court in passing on a suppression ruling is a limited one. The empirical component of a suppression ruling, like any other form of fact finding, is the basic responsibility of the trial court, involving as it does a weighing of evidence and an assessment of credibility. Appellate courts are incapable of these functions and must accordingly refrain from deciding factual questions *de novo* merely because they might have found the facts differently. *Maine v. Taylor*, 477 U.S. —, —, 106 S.Ct. 2440, 2451, 91 L.Ed.2d 110 (1986). As long as the trial court applies the correct legal standard in suppressing a confession, and as long as its factual findings are not clearly erroneous—the findings, in other words, are supported by some evidence in the record—the suppression ruling should be upheld. *E.g. Raffaelli*, 647 P.2d 230; *People v. Thorpe*, 641 P.2d 935 (Colo.1982); *People v. Quintana*, 198 Colo. 461, 601 P.2d 350 (1979); *People v. Pineda*, 182 Colo. 385, 513 P.2d 452 (1973); *People v. Medina*, 180 Colo. 56, 501 P.2d 1332 (1972). The trial court's suppression ruling in this case clearly meets that benchmark and should accordingly be affirmed.

### III.

The majority attempts to justify its vacation of the suppression order on the basis of this court's recent decision in *People v. Smith*, 716 P.2d 1115. *Smith*, however, did not promulgate a new rule of law, but was simply an application of the traditional "totality of circumstances" standard to the evidentiary state of the record. To interpret *Smith* as creating a *per se* standard for judging the voluntariness of a confession, as the majority does, is to misread that case.

In *Smith*, the defendant was arrested for stabbing the victim in a tavern and was advised of her *Miranda* rights. At the station house the defendant briefly told a detective that "I just had to do it" because "[h]e's been bothering me so much." About twenty minutes later the defendant inquired of the detective about the victim's condition and was told that he had died. The defendant then became emotionally upset and stated: "I didn't want to hurt him. He just kept—he pulled the knife on me and I took it away and I stabbed him. I didn't mean to hurt him." The defendant thereafter became defiant and refused to sign a *Miranda* waiver or to make any further statement to the detective. The trial court suppressed the defendant's statement on the basis that "the effect on 'the normal person' of learning that the victim had died would be so traumatic as to overbear the person's will." *Smith*, 716 P.2d at 1117. This court reversed, stating that "[s]imply because the defendant became upset when she learned that the victim had died was not a sufficient basis for the trial court's conclusion that her statement was involuntary." *Id.* at 1118. I specially concurred in *Smith* because I believed then, as I believe now, that the trial court's suppression order was clearly erro-

neous in that there was nothing in Smith's mental or emotional state that provided a rational basis for concluding that her confession was not voluntarily made.

In contrast to the facts of *Smith*, the defendant here did not merely experience emotional anxiety upon learning of her husband's death, but, as the trial court found, she became distraught to the point of passing out at the hospital and continued to manifest extreme emotional distress throughout the lengthy tape-recorded interrogation. Moreover, again in contrast to the facts of *Smith*, the defendant at the outset of that interrogation unsuccessfully requested three times to speak to her mother in order to obtain advice about what she should do. These requests were ignored, as was the defendant's later request during the interview to make a telephone call to her brother. While the defendant's requests did not have the significance of a request to confer with counsel or to invoke her constitutional privilege against self-incrimination, *see Fare v. Michael C.*, 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979), they did constitute an appropriate factor for the district court to consider on the issue of voluntariness, along with Officer Wood's repeated disregard of the defendant's requests and the defendant's mental and emotional condition prior to and during the interrogation.

It was the prerogative of the trial court, in the exercise of its fact-finding function, to determine what weight, if any, should be given to the various factors and circumstances bearing on the issue of voluntariness. Although that issue obviously presented a close question, I cannot say that the state of the record is such that the trial court's ruling is clearly erroneous. Nor can I agree with this court that our decision in *Smith* promulgated a new standard of voluntariness that somehow invalidated the trial court's resolution of the suppression motion.

I would affirm the order of suppression.

I am authorized to say that Justice DUBOFSKY and Justice LOHR join me in this dissent.