The PEOPLE of the State of Colorado, Plaintiff-Appellant,

v.

Cheryel Kay RHODES, Defendant-Appellee.

No. 85SA378.

Supreme Court of Colorado, En Banc.

Dec. 22, 1986.

Barney Iuppa, Dist. Atty., Jeanne S. Bennett, Robert Brown, Chief Deputy Dist. Attys., Daniel H. May, Deputy Dist. Atty., Colorado Springs, for plaintiff-appellant.

David F. Vela, Colorado Public Defender, Michael A. Warren, Deputy Public Defender, Colorado Springs, for defendant-appellee.

DUBOFSKY, Justice.

In this interlocutory appeal under C.A.R. 4.1, the People contest a ruling of the El Paso County District Court suppressing inculpatory statements made by the defendant, Cheryel Kay Rhodes, and evidence derived from the statements. The district court, considering testimony about the defendant's mental condition at the time she made the statements in light of this court's

---

decision in *People v. Connelly*, 702 P.2d 722 (Colo.1985), concluded that the prosecution had failed to meet its burden of showing that the statements were voluntary. The United States Supreme Court reversed our decision in *People v. Connelly*. *Colorado v. Connelly*, —— U.S. ——, 107 S.Ct. 515, 93 L.Ed.2d —— (1986). Therefore, we reverse the ruling of the district court.

### I.

At 9:55 a.m. on July 26, 1984, the defendant approached the desk officer at the Colorado Springs police department and asked to see Lieutenant Paul Ricks. While the desk officer was attempting to reach Lieutenant Ricks by telephone the defendant stated, "Tell him I just killed a man and that I need to see him now." Lieutenant Ricks arrived about five minutes later and recognized the defendant as an acquaintance of ten or eleven years. The defendant told Lieutenant Ricks that she needed to talk to him, and he took her into an office. When Lieutenant Ricks asked her what she wanted to talk to him about, the defendant stated that she had just killed a man. Lieutenant Ricks then advised the defendant of her *Miranda* rights.[1] When asked by Lieutenant Ricks if she understood her rights, the defendant said yes. She also stated that she did not wish to discuss the killing with Lieutenant Ricks. She then handed him a holster and a brown paper bag containing a box of bullets and told him, in Lieutenant Ricks' words, that "she had just killed a man, but if we hurried, he might still be alive." Lieutenant Ricks asked the defendant where the victim could be found and she gave him an address. Detectives dispatched to the location found that the victim, the defendant's former boyfriend, had been shot six times and was dead. Meanwhile the defendant made a number of spontaneous statements to Lieutenant Ricks about the shooting.

At 10:55 a.m., a detective assigned to assist in the homicide investigation arrived at the station and began filling out a custody report. While the detective asked the defendant routine questions about her place of residence, employment and the like, the defendant continued to talk about the shooting, even after the detective cautioned her that the statements would be recorded. The defendant was taken by another officer to a hospital for testing and, about two hours later, was booked into the El Paso County Jail. Although the defendant had been crying at one point, the police officers who observed her before she was admitted to jail testified that she was generally calm and composed and that her statements and responses to questions were coherent.

After indictment for first degree murder, the defendant moved to suppress the inculpatory statements and evidence derived from them on the ground that her mental condition rendered the statements involuntary. In support of her motion to suppress, the defendant presented the testimony of two experts.

Dr. Paul Freda, a staff psychiatrist at the Colorado State Hospital, had examined the defendant on July 26, 1984, after she had been transferred to the state hospital from the county jail by court order in a civil commitment proceeding.[2] Dr. Freda testified that the defendant suffered from a borderline personality disorder and that she was psychotic at the time of the shooting.[3] He believed that the defendant was still in a psychotic state when she made the challenged inculpatory statements. He stated specifically that "[t]he confession ... was not the product of a free intellect

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. The defendant was transferred back and forth from the jail to the hospital several times because jail officials believed she was suicidal or because the court had ordered a competency determination.

3. Dr. Freda described the defendant's condition as follows:

 Given the primary diagnosis of borderline personality disorder, [the defendant] suffered from a very defective sense of identity, very poor ego functioning and a tendency to—when stressed, to have transient psychotic episodes.

and a rational mind, because [the defendant] was overburdened or overborne with the psychosis." Dr. Lenore E. Walker, a psychologist, examined the defendant in February, 1985. Dr. Walker concluded, on the basis of her interview with the defendant and information from the defendant's hospitalization including psychological tests, that the defendant was psychotic at the time of the homicide. She believed that an unconscious psychotic process compelled the defendant's inculpatory statements.

In rebuttal, the People presented the testimony of Dr. Seymour Sundell, a forensic psychiatrist. In evaluating the defendant's mental condition, Dr. Sundell examined police reports and psychiatric evaluations including a report prepared by Dr. Walker. Dr. Sundell also interviewed the defendant twice. He diagnosed the defendant as suffering from a primary affective disorder with severe depression after the shooting and also from an ongoing mixed personality disorder. However, in Dr. Sundell's opinion, the defendant's mental disorder at the time of the shooting did not rise to the level of legal insanity or mental impairment. Dr. Sundell stated that while the defendant was experiencing anxiety, stress, and "a tremendous amount of emotional pressure" when she made the inculpatory statements, there was nothing in her mental condition at the time "that would have prevented her from exercising free will or voluntarily engaging" in interactions with the police officers.

On cross-examination, Dr. Sundell stated that the defendant exhibited symptoms of psychosis after she was hospitalized following her arrest. However, he stated that there was no evidence that she was psychotic at the time of the shooting, no evidence of "disorganization, psychosis, bizarre, hallucinations, or delusional material" affecting the defendant when she made

the inculpatory statements and no evidence of prior mental illness such as schizophrenia. He concluded that the "driving force" behind the statements was emotional and traumatic stress rather than a "true, medical psychiatric illness." [4]

In ruling on the suppression issue, the district court adopted Dr. Freda's opinion that the defendant at the time of the shooting was psychotic and that her statements to the police were a product of a psychosis and not a result of free will. The court therefore ordered all of the inculpatory statements suppressed under *People v. Connelly.*[5]

## II.

 As summarized in *People v. Connelly,* 702 P.2d at 728, a confession, to be admissible as evidence against an accused at trial, must have been voluntary, *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); *People v. Freeman,* 668 P.2d 1371 (1983); *People v. Raffaelli,* 647 P.2d 230 (1982); when a defendant claims that a confession was involuntary, the prosecution must establish by a preponderance of the evidence the voluntary nature of the confession, *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *Raffaelli,* 647 P.2d at 235; the goal of the voluntariness inquiry is to determine whether the challenged statement was the product of a rational intellect and a free will, *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); in making such a determination, a trial court must consider all of the circumstances surrounding the making of the statement, *Freeman,* 668 P.2d at 1378; *Raffaelli,* 647 P.2d at 235; and the mental condition of the person making the statement at the time the statement is made is one of the factors relevant to the question of voluntariness, *Raffaelli,*

4. Dr. Sundell distinguished a psychotic act from the stress the defendant experienced as follows: If it were done because God told her to do it or she felt and perceived and intensely believed that God told her to do it or if it was done because she felt this guy was a K.G.B. agent and was poisoning her food, then it would have been a psychotic act. If it's done

out of tremendous jealousy and hatred and anger, then no, it's not a psychotic act.

5. The district court also denied the prosecution's request for discovery of three psychiatric experts retained but not called to testify by the defense.

647 P.2d at 235; *People v. Parks*, 195 Colo. 344, 579 P.2d 76 (1978). We then concluded under the unusual facts in *People v. Connelly*[6] that a trial court's finding that a statement was involuntary could be supported solely by evidence that the statement was impelled by a serious mental disorder.

 In *Colorado v. Connelly*, — U.S. —, 107 S.Ct. 515, 93 L.Ed.2d — (1986) the United States Supreme Court reversed our decision in *People v. Connelly*. The Supreme Court held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." — U.S. at —, 107 S.Ct. at 522. Here, the record of the suppression hearing, at which the circumstances surrounding the confession were fully explored, does not indicate that the defendant's statements were induced by coercive police activity. Because the district court in this case relied on the holding in *People v. Connelly* that a finding that a statement was involuntary could be supported solely by evidence that the statement was impelled by a serious mental disorder, *Colorado v. Connelly* requires reversal of the district court's order. As the Supreme Court noted, "[I]nquiries into the state of mind of a criminal defendant who has confessed" are "to be resolved by state laws governing the admission of evidence.... A statement rendered by one in the condition of [Connelly] might be proved to be quite unreliable, but this is a matter to be governed by the evidentiary laws of the forum, *see, e.g.,* Fed. Rule Evid. 601, and not by the Due Process Clause of the Fourteenth Amendment." — U.S. at —, 107 S.Ct. at 522.

We reverse the district court's order suppressing the defendant's inculpatory statements.[7]

6. In *People v. Connelly*, 702 P.2d at 725, the uncontroverted evidence established that when the defendant made the inculpatory statements he was suffering from a serious mental disorder, a psychosis that compelled him to follow the mandate of God and confess his crime to the police or commit suicide.

7. We express no opinion on whether the police officers honored the defendant's *Miranda* rights. This issue was not addressed by the district court. We also decline to address the district court's denial of the prosecution's request to discover the reports of three psychiatrists engaged by the defense. Our decision reversing the suppression order obviates the People's need for the reports to prove before trial that the defendant's statements were voluntary. The People's asserted need for the reports to respond to a defense of impaired mental condition is not subject to review under C.A.R. 4.1.