22CA0464 Peo v Shukurov 09-05-2024 COLORADO COURT OF APPEALS Court of Appeals No. 22CA0464 Arapahoe County District Court No. 19CR3687 Honorable Joseph Whitfield, Judge The People of the State of Colorado, Plaintiff-Appellee, v. Furkatjon A. Shukurov, Defendant-Appellant. JUDGMENT AFFIRMED Division VII Opinion by JUDGE GOMEZ Tow and Kuhn, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced September 5, 2024 Philip J. Weiser, Attorney General, Caitlin E. Grant, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee Megan A. Ring, Colorado State Public Defender, Kevin M. Whitfield, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant 
1 ¶ 1 Defendant, Furkatjon A. Shukurov, appeals the judgment of conviction entered on jury verdicts finding him guilty of second degree assault (strangulation) and third degree assault. He contends that the trial court reversibly erred by (1) denying his motion to suppress evidence obtained from officers’ entry into and search of his home; (2) denying his motion to suppress statements he made to officers at his home; (3) denying his for cause challenge to a juror; and (4) allowing two witnesses to opine on the truthfulness of the victim’s testimony. We disagree with those contentions and therefore affirm the judgment. I. Background ¶ 2 One night, the victim — Shukurov’s wife — called 911 and reported that Shukurov had “beat” her with his hands about two hours before and was still in the home with her and their children. She said that she wasn’t hurt and didn’t want an ambulance sent because she didn’t want to wake the children. ¶ 3 Three police officers arrived at Shukurov’s home, knocked on the front door, and announced, “Sheriff’s office. Step outside.” When Shukurov opened the door, one of the officers ordered him to stand against the wall and performed a pat down. Nothing was 
2 discovered in the pat down. Another officer asked Shukurov — whose first language is Russian — if he “underst[oo]d English pretty well.” He nodded and said, “Yeah, yeah.” The officer then asked, “Is it okay if we all go inside and talk?” Shukurov nodded again; motioned to the door; and said, “Yeah, yeah.” The officers followed him inside. One officer went through the home while two others stayed with Shukurov. At some point, a fourth officer also arrived and briefly went through the home. ¶ 4 With the aid of Russian translators, the officers interviewed Shukurov and the victim in different rooms for about fifteen to twenty minutes each. ¶ 5 The victim told officers that Shukurov had struck her in the leg and arm, choked her, and threatened to kill her. Officers documented several injuries, including bruises on her arm and leg (one of which appeared in the shape of a knuckle), a cut on her neck, and pieces of her hair that she said Shukurov had pulled out. ¶ 6 Shukurov denied the assault. He said he and the victim had had an argument, but he hadn’t struck her. Officers observed scratches on Shukurov’s face and neck, which he said he’d gotten 
3 when he climbed a ladder at work and scratched himself on some branches. ¶ 7 After interviewing both parties, the officers instructed Shukurov to stand up and face the wall, placed him in handcuffs, and took him out to a patrol car. As they were doing so, Shukurov cried and said “last time” a few times. He also said something to the effect of “I won’t hit my wife anymore.” ¶ 8 Before trial, Shukurov filed three motions to suppress, arguing that (1) the officers’ entry into his home was illegal and, therefore, all evidence, observations, and statements obtained from that entry were inadmissible; (2) the statements he made to officers at his home should be suppressed because they were obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966); and (3) the statements he made to officers should be suppressed because they were involuntary. After a hearing, the trial court denied all three motions. ¶ 9 At trial, the victim recanted her previous allegations that Shukurov had assaulted her. Instead, she testified that her injuries occurred when she “fell down the stairs” and that she’d called 911 in a “nervous breakdown” due to medications she’d taken that day. 
4 ¶ 10 Following a four-day trial, the jury found Shukurov guilty as charged. He was sentenced to a ninety-day term in jail followed by three years of probation. II. Search & Seizure ¶ 11 Shukurov challenges the trial court’s denial of his first motion to suppress, which related to the officers’ entry into and search of his home. Specifically, Shukurov contends that the court erred by concluding that (1) the pat down was legal; (2) officers had valid consent to enter his home; and (3) the search was appropriate in scope. We are not persuaded. ¶ 12 Our review of a suppression order presents a mixed question of fact and law. People v. Berdahl, 2019 CO 29, ¶ 18. We defer to the trial court’s factual findings, such as findings of historical facts underlying the issue of consent to search, if they are supported by the record. Id.; see also People v. Chavez-Barragan, 2016 CO 66, ¶ 34. But we assess de novo the legal effect of those facts, such as whether a search was constitutional. Berdahl, ¶ 18; see also People v. McKnight, 2019 CO 36, ¶ 21; Chavez-Barragan, ¶ 34. 
5 A. The Pat Down ¶ 13 Shukurov initially argues that officers illegally patted him down when they arrived at his home and that this illegal pat down influenced his response when, soon thereafter, they asked to go inside. We disagree that the pat down was illegal. ¶ 14 Patting down a suspect for weapons is a type of investigatory stop — an intermediate form of governmental intrusion, falling in between a consensual encounter and an arrest. See People v. King, 16 P.3d 807, 814 (Colo. 2001); People v. Barnard, 12 P.3d 290, 293 (Colo. App. 2000). ¶ 15 To subject a person to an investigatory stop, three conditions must be met: (1) there must be a specific and articulable basis in fact for suspecting criminal activity; (2) the purpose of the stop must be reasonable; and (3) the scope and character of the stop must be reasonably related to its purpose. Id. To pat down that person during the stop, an officer must also have a reasonable basis to suspect that the person might be armed and dangerous. People v. Martinez, 801 P.2d 542, 544 (Colo. 1990). 
6 ¶ 16 Shukurov challenges only the final requirement: the existence of a reasonable basis to suspect he might’ve been armed and dangerous. We conclude that this requirement was satisfied. ¶ 17 As the trial court explained, officers learned from the 911 dispatcher that Shukurov had allegedly “beaten his wife” and “threat[ened] . . . to kill his wife” two hours earlier. The officer who later conducted the pat down also recalled hearing over the radio from dispatch about a previous law enforcement contact where Shukurov was armed with a handgun and was uncooperative. ¶ 18 This information supports a reasonable belief that Shukurov may have been armed and dangerous. See People v. Mascarenas, 972 P.2d 717, 721 (Colo. App. 1998) (officers had a sufficient basis to pat down a domestic violence suspect, in part because they “knew that domestic violence situations were particularly dangerous”); People v. Allen, 2019 CO 88, ¶ 26 (“[I]nformation regarding the possibility that [the defendant] was carrying a handgun” provided support for a pat down.); see generally People v. Chavez, 240 P.3d 448, 451 (Colo. App. 2010) (“When officers respond to a domestic abuse call, they understand that ‘violence may be lurking and explode with little warning.” (quoting United 
7 States v. Martinez, 406 F.3d 1160, 1164 (9th Cir. 2005))) (alteration omitted). Thus, the officers “were permitted to conduct a minimally intrusive frisk or pat-down search of [Shukurov] for safety purposes.” People v. Johnson, 2024 CO 47, ¶ 41. ¶ 19 We reject Shukurov’s arguments to the contrary. He notes that one of the other responding officers didn’t recall any information from dispatch about a prior encounter involving a gun. But that’s irrelevant, as one officer testified to hearing the information, and the trial court accepted that testimony as true. He also suggests that it should’ve been obvious to the officers once they interacted with him that he didn’t have a weapon, as he was compliant with their requests, didn’t make any furtive gestures, and wore tight-fitting clothes that revealed various places where a weapon could’ve been lodged. But given the other circumstances suggesting the possibility of a weapon, as well as the other places where one could’ve been hidden, it was still reasonable to fear that he might’ve been armed and dangerous. 
8 B. Consent to Enter the Home ¶ 20 Shukurov also argues that he didn’t voluntarily consent to the officers’ entry into his home, and thus the intrusion into his home was illegal. We disagree. ¶ 21 Police may enter and search a person’s home without a warrant if the person freely and voluntarily consented to it. People v. Stone, 2021 COA 104, ¶¶ 35-36. To assess whether a person’s consent was voluntary, we apply an objective test based on the totality of the circumstances. Berdahl, ¶ 23. Relevant factors include the defendant’s age, education, and intelligence; the duration, location, and circumstances of the search; the defendant’s state of mind; and any other factors that could’ve affected the defendant’s free and unconstrained choice in consenting. Id. ¶ 22 Like the trial court, we conclude that Shukurov voluntarily consented to the officers entering his home. As the court found, the officers “casual[ly] knock[ed]” on Shukurov’s door when they arrived, and “[n]o weapons or tasers were drawn.” See Chavez-
Barragan, ¶ 48 (consent to a search was voluntary where officers were “polite” and didn’t act “threateningly”). When asked, after the pat down, if they could “all go inside and talk,” Shukurov nodded; 
9 motioned to the door; and said, “Yeah, yeah.” See People v. Bostic, 148 P.3d 250, 254 (Colo. App. 2006) (consent to entry into a motel room was voluntary where officers “asked . . . whether they could speak with [the defendant] inside,” and “she stepped back, held the door open, . . . allowed the officers into the room . . . [and] responded ‘sure’”) (alteration omitted). ¶ 23 Although Shukurov’s first language is Russian, we agree with the trial court that any language barrier didn’t invalidate his consent. The record supports the court’s finding that, in their initial contact without a Russian interpreter, “[Shukurov] appeared to understand them.” See Chavez-Barragan, ¶ 55 (consent to a search was voluntary where the defendant “spoke English well enough to reliably communicate with [the officer]”). Indeed, when asked if he understood English “pretty well,” Shukurov nodded and responded, “Yeah, yeah.” And as the court noted, Shukurov “state[d] in English that he d[id] not mind if the officers c[a]me inside.” ¶ 24 Furthermore, nothing in the record suggests that officers used any language barrier to coerce Shukurov into consenting. See People v. Munoz-Gutierrez, 2015 CO 9, ¶ 34 (consent to a search 
10 was voluntary where “[t]here [wa]s no record that [officers] used the language barrier to coerce or attempt to trick [the defendant] into providing consent”). In fact, as the trial court observed, officers contacted a Russian translator when speaking to Shukurov in greater detail inside. But even with the assistance of a translator, “[Shukurov] never indicated not wanting to speak to the deputies, or that they were not permitted to be in his residence.” ¶ 25 Therefore, the totality of circumstances indicates that Shukurov voluntarily consented to officers entering his home. C. The Scope of the Search ¶ 26 As his last argument concerning officers’ entry into his home, Shukurov argues that even assuming that he consented to the officers’ entry into his home, the officers unlawfully searched his home beyond the scope of his limited consent. More specifically, he argues that, at most, he consented to going inside to talk with the three officers who initially came to his door — not to the officers’ search of his entire home or to the entry of a fourth officer into his home. Again, we disagree. Even if Shukurov’s consent was so limited, once the officers were inside, exigent circumstances 
11 justified their broader search of the home to ensure the safety of the victim and the children. ¶ 27 Under the exigent circumstances exception to the warrant requirement, “[a] prompt and limited warrantless search of a scene at which violence has occurred may . . . be necessary to determine if there are any injured parties.” People v. Thompson, 770 P.2d 1282, 1285 (Colo. 1989). As relevant here, this exception applies where there is probable cause of criminal activity and “a colorable claim of emergency threatening the life or safety of another.” People v. Aarness, 150 P.3d 1271, 1277 (Colo. 2006). The scope of such a search is governed by the exigent circumstances justifying it. Id.; see also Thompson, 770 P.2d at 1285. ¶ 28 Domestic violence often gives rise to exigent circumstances because “violence may be lurking and explode with little warning,” and “‘[t]he signs of danger may be masked’ by a battered victim’s fear or dependence.” Chavez, 240 P.3d at 451 (first quoting Martinez, 406 F.3d at 1164; and then quoting Fletcher v. Town of Clinton, 196 F.3d 41, 50 (1st Cir. 1999)). ¶ 29 For example, in Chavez, a division of this court found exigent circumstances based on a 911 call reporting a physical altercation 
12 between the caller’s mother and the defendant. Id. at 452. “True 911 calls,” the division explained, “by their very nature, involve emergencies.” Id. The exigency apparent from the daughter’s 911 call was heightened by officers’ observations when they arrived on the scene — a dark home and no response to their repeated knocks on the front door. Id. Thus, the division found the warrantless entry and search of the home was justified. Id. ¶ 30 Here, too, the victim’s 911 call, combined with officers’ observations upon arrival, established both probable cause of a crime and a colorable claim of an emergency threatening the victim’s (and potentially the children’s) safety. From the 911 call, the officers learned that Shukurov allegedly beat and threatened to kill his wife. The victim had told the dispatcher that Shukurov was still there, as were their children; that he’d beaten her before; and that she “d[id]n’t know how to protect [her]self.” As in Chavez, the nature of the 911 call, in and of itself, may have created exigent circumstances. But even if it didn’t, the exigency was heightened by officers’ observations as they entered the home with Shukurov’s consent and observed scratches on his face and neck. Thus, a limited warrantless search was justified. 
13 ¶ 31 Shukurov challenges the trial court’s finding that the victim was in the front room as officers entered the home. Although one of the responding officers testified at the suppression hearing that the victim “was walking into the front room” as they entered the home, the body camera footage indicates that, in fact, she was in the back part of the home and not immediately visible when the officers went inside. But even assuming she was not immediately visible, the officers were justified in trying to locate her (and the children), given Shukurov’s visible injuries and her statement that he’d beaten and threatened to kill her. ¶ 32 Shukurov also argues, citing People v. Allison, 86 P.3d 421, 427 (Colo. 2004), that there was no exigency because the victim had indicated on the 911 call that the incident had occurred two hours before and that she wasn’t injured. But in Allison, the warrantless search following an alleged domestic violence incident occurred only after the defendant and victim had both come out of the home, there was no indication that anyone else was inside, and “no immediate crisis remained.” Id. at 427. Here, by contrast, officers had reason to know that the victim had been beaten and threatened with her life and that she and the couple’s children were still inside 
14 the home. Officers also didn’t have to credit the victim’s statements that the incident was over and that she wasn’t injured, particularly given her indication that Shukurov was still in the home with her. See Thompson, 770 P.2d at 1286 (officers could’ve believed that the victim’s statements that the defendant was “gone” and “[e]verything[ was] okay” “were made under duress because the [defendant] was still present”); see also Chavez, 240 P.3d at 451. ¶ 33 Finally, Shukurov doesn’t contest the fact that once officers found the visibly injured victim, they were justified in staying with her to interview her, assess her injuries, and protect her from any further violence. Accordingly, the scope of the search was properly limited by the exigent circumstances justifying it. III. Miranda & Voluntariness ¶ 34 Shukurov next challenges the trial court’s denial of his other two motions to suppress, which related to his statements to officers at his home. Specifically, he contends that (1) the officers’ questioning constituted custodial interrogation, violating his Miranda rights; and (2) his post-arrest statements were involuntary. We disagree with both contentions. 
15 A. Custodial Interrogation ¶ 35 Like the trial court, we conclude that the interview in Shukurov’s home didn’t constitute custodial interrogation because he wasn’t in custody. Accordingly, Shukurov’s statements during the interview weren’t obtained in violation of his Miranda rights. ¶ 36 Whether a person was in custody for Miranda purposes is a mixed question of law and fact. People v. Bohler, 2024 CO 18, ¶ 17. We rely on undisputed facts in the record and defer to the trial court’s factual findings when they’re supported by the record, although we may independently review recordings, including police bodycam footage. Id. But we review de novo the legal question whether those facts, taken together, establish that the person was in custody. People v. Pleshakov, 2013 CO 18, ¶ 16. ¶ 37 To uphold the Fifth Amendment privilege against self-
incrimination, officers must provide certain warnings before a custodial interrogation. Bohler, ¶ 18. “Custody for Miranda purposes depends on whether a reasonable person in the defendant’s position would believe they were in police custody ‘to a degree associated with a formal arrest.’” Id. at ¶ 19 (quoting People v. Cline, 2019 CO 33, ¶ 2). To determine if a defendant was in 
16 custody at the time of a police encounter, we consider (1) the time, place, and purpose of the encounter; (2) the persons present during the encounter; (3) the words an officer spoke to the defendant; (4) the officer’s tone of voice and demeanor; (5) the length and mood of the encounter; (6) whether officers placed any limitation of movement or other form of restraint on the defendant; (7) the officer’s response to any questions the defendant asked; (8) whether directions were given to the defendant; and (9) the defendant’s verbal or nonverbal response to such directions. Id. ¶ 38 Based on the trial court’s findings on these factors, which are supported by the record, as well as our own independent review of the bodycam footage, we conclude that Shukurov wasn’t in custody at the time he spoke with officers in his home. ¶ 39 As the trial court found, the time, place and purpose of the encounter weighs against a finding of custody. Officers arrived at Shukurov’s and the victim’s shared residence — a neutral, familiar location — in response to the victim’s report of domestic violence. See People v. Davis, 2019 CO 84, ¶ 27 (“[A] neutral or familiar location such as the suspect’s home can weigh against a finding of 
17 custody.”). And, as the court found, “[t]he purpose was to respond to the victim’s call for help to 911.” ¶ 40 The number of persons present during the encounter also weighs against a finding of custody. Although four officers entered Shukurov’s home, only one officer interviewed him; the others were talking to the victim or engaging in other tasks and, at most, briefly spoke to him. See Pleshakov, ¶ 30 (the defendant wasn’t in custody because, “[a]lthough there were four officers present at the scene, [one officer and the defendant] conversed alone while the remaining officers engaged in other tasks”). ¶ 41 The words used by the officer who interviewed Shukurov further indicate that Shukurov wasn’t in custody. As the trial court found, the officer used a “simple question and answer technique, nothing untoward or out of the ordinary,” and his questions were “consistent with the investigation of an alleged domestic assault that occurred two hours prior.” ¶ 42 Likewise, the tone of voice and demeanor of the officer who interviewed Shukurov indicates that Shukurov wasn’t in custody. The court found, and the bodycam video confirms, that the officer’s tone was “conversational” and his demeanor was “calm,” “other 
18 than elevating his voice to control the situation when [Shukurov] yelled at the victim during the contact.” See Davis, ¶ 34 (the defendant wasn’t in custody where “the mood of [the] interrogation was calm and conversational”). ¶ 43 The same is true of the length and mood of the encounter. As the court found, “[t]he questioning lasted 15-20 minutes,” and none of the officers made any “threats” to Shukurov. In all, the officers were in Shukurov’s home less than forty-five minutes before they arrested him. See People v. Allman, 2012 COA 212, ¶ 49 (the defendant wasn’t in custody where questioning “took no more than fifteen to twenty minutes” and officers didn’t “threaten or accuse” the defendant). ¶ 44 The factor of restraints or limitations on movement is relatively neutral. While the officers locked the front door and one of them told another not to let Shukurov go anywhere, it’s unclear whether Shukurov was aware of those actions or statements. Cf. People v. Matheny, 46 P.3d 453, 468 (Colo. 2002) (“[A]n officer’s unarticulated plan has no bearing on the question of whether a suspect was ‘in custody’ at a particular time.” (quoting Stansbury v. California, 511 U.S. 318, 323 (1994))). Certainly, as the trial court found, 
19 Shukurov “was not restrained and not in handcuffs.” See Allman, ¶ 49 (the defendant wasn’t in custody where he “was not restrained or limited in movement”). And while he was told to sit on the couch in his front room, to later move to another part of the couch, and to stay still, “direction to sit down [i]s a minor restraint at most.” Bohler, ¶ 30. ¶ 45 Officers responded positively to Shukurov’s questions and requests, which weighs against a finding of custody. When Shukurov requested water, an officer retrieved some for him. And when Shukurov asked if he was being arrested, an officer told him that he wasn’t being arrested at that time. Cf. Pleshakov, ¶ 31 (“A reasonable person would not perceive [an officer’s statement that he believed he had enough information to obtain a warrant] to be the functional equivalent of an arrest.”); People v. Figueroa-Ortega, 2012 CO 51, ¶ 10 (“[T]hreatening, no matter how confidently, to charge [a defendant] with a crime at some point in the future does not, by itself, constitute [an arrest] . . . .”). The officer also explained that Shukurov has “a lot of rights,” even though he’s a “suspect of something,” and that the officers “need to make sure everybody’s rights are being respected here.” 
20 ¶ 46 Finally, officers’ directions and Shukurov’s response to those directions weigh slightly against a finding of custody. Although the officers requested in a nonthreatening way that Shukurov sit on the couch in the front room, move his position to another side of the couch, stay put, and not talk to the victim, the trial court found that these were merely efforts to “separate the parties,” “divide [the officers’ attention between them,” and prevent the “victim [from] being intimidated.” See Bohler, ¶ 33 (the defendant wasn’t in custody where “requests did not feature force, threats of negative consequences for not complying, or an aggressive tone” and “were related to immediate safety, which does not indicate custody”). Shukurov for the most part complied, though he did try several times to speak to the victim, sometimes yelling toward her in the next room. See People v. Garcia, 2017 CO 106, ¶ 36 (the fact that the defendant ignored an officer’s request to stop using her phone cut against a finding of custody). ¶ 47 These facts are far different from those in People v. Minjarez, 81 P.3d 348 (Colo. 2003), on which Shukurov relies. In that case, the supreme court concluded the defendant was in custody when officers had him brought into a private room in the hospital where 
21 his child was being treated; interviewed him for forty-five minutes, and for much of that time created “a highly confrontational and accusatory atmosphere that was clearly aimed at obtaining a confession”; asked questions “designed essentially to force agreement from the defendant”; and “confronted the defendant with the evidence against him and with [the questioner’s] own belief in [his] guilt.” Id. at 351, 356. Here, by contrast, Shukurov was interviewed in his own home in a far more conversational and less confrontational manner. ¶ 48 On balance, the totality of the circumstances in this case indicates that Shukurov was not in custody for purposes of Miranda when he was interviewed in his home. B. Voluntariness ¶ 49 We also conclude that the only statements Shukurov challenges on the basis of voluntariness — “last time” and “I won’t hit my wife anymore” — were, in fact, voluntary. Although Shukurov was in custody by the time he made these statements, the statements were spontaneous and not the result of any interrogation. Thus, the introduction of the statements at trial didn’t violate Shukurov’s Miranda rights. 
22 ¶ 50 Whether a suspect’s statement was voluntary is a mixed question of law and fact. People v. Sanders, 2023 CO 62, ¶ 10. We defer to the trial court’s underlying factual findings if they are supported by the record, but we review de novo the ultimate legal question of whether a statement was voluntary. Effland v. People, 240 P.3d 868, 878 (Colo. 2010). ¶ 51 To be voluntary, a statement must be the product of an essentially free and unconstrained choice and cannot have been the product of coercive government conduct that overbore the suspect’s will. Sanders, ¶ 14. Voluntariness is determined by considering the totality of the circumstances under which a statement was made, including such factors as (1) whether the defendant was in custody or free to leave and was aware of that fact; (2) whether the defendant was advised of, understood, and waived their Miranda rights before any interrogation; (3) whether the defendant had the opportunity to confer with counsel or anyone else before the interrogation; (4) whether the challenged statement was made during the course of an interrogation or was volunteered; (5) whether any overt or implied threats or promises were directed to the defendant; (6) the method and style of questioning and the 
23 length and place of the interrogation; and (7) the defendant’s mental and physical condition, educational background, employment status, and prior experience with law enforcement and the criminal justice system. People v. Gennings, 808 P.2d 839, 844 (Colo. 1991). ¶ 52 Based on the trial court’s findings on these factors, which are supported by the record, we conclude that the challenged statements were voluntary. ¶ 53 The facts that Shukurov was in custody, hadn’t received Miranda warnings, didn’t have the chance to confer with anyone before he made the statements, and had expressed a fear of law enforcement weigh against a finding of voluntariness. ¶ 54 However, the other factors indicate that Shukurov’s post-
arrest statements were voluntary. Most critically, as the trial court found, with record support, although Shukurov continued to talk after he’d been handcuffed and arrested, his post-arrest statements were “spontaneous and not in response to questions from law enforcement. No statements were elicited from him once he was in custody.” The body camera recording shows Shukurov repeatedly saying “last time,” though officers weren’t questioning him but were merely seeking to locate his shoes at the time. And the officer who 
24 heard Shukurov say, “I won’t hit my wife anymore,” testified at the suppression hearing that Shukurov said it “three or four times” and that it was not “in response to any question or any statement” the officer had made. See People v. Wood, 135 P.3d 744, 752 (Colo. 2006) (“A defendant’s spontaneous utterances will not be excluded where there is no interrogation.”), aff’d, 255 P.3d 1136. ¶ 55 Additionally, nothing leading up to Shukurov being placed in custody suggests that his post-arrest statements were coerced. As the trial court found, the officers made “no threats or promises”; the “method and style were [a] simple question and answer technique”; “[t]here [was] no showing that the deputies acted coercively”; and the interview lasted for fifteen to twenty minutes and occurred in Shukurov’s home — all of which weigh in favor of voluntariness. The court acknowledged that “[Shukurov] appeared sad and upset at times” but found that, “given the circumstances,” his reaction was “not unusual” and didn’t lead “to the contact becoming coercive, overbearing, or unconstitutional.” See People v. Pearson, 725 P.2d 782, 784 (Colo. 1986) (a defendant’s emotional distress isn’t in and of itself a sufficient basis to conclude that their statement is involuntary). 
25 ¶ 56 In light of these factors, this case is nothing like People v. Raffaelli, 647 P.2d 230 (Colo. 1982), which Shukurov cites. There, following the defendant’s arrest and Miranda advisement, an officer continued talking with the defendant, ultimately “bec[o]m[ing] more accusatory,” “question[ing] [the defendant] closely about the details of [the defendant’s] story,” saying he would “tear [the defendant’s] story up in court,” and insisting that he “wanted the truth about the situation and not a lie.” Id. at 231-32. In this case, the challenged statements weren’t made in response to any continued questioning by the officers. Nor was the questioning in this case ever as accusatory as that described in Raffaelli. ¶ 57 Therefore, we conclude that Shukurov’s post-arrest statements were voluntary and were properly admitted at trial. IV. For Cause Juror Challenge ¶ 58 Shukurov also contends that the trial court erred by denying his for cause challenge to a juror who sat on the jury. We disagree. ¶ 59 During voir dire, defense counsel asked the venire, If a woman comes to court and accuses a man of being physically violent with her on one incident, . . . and during the course of that you hear evidence that the same man has been physically violent with her in the past, can I 
26 get a show of hands of who here thinks that means he’s probably a little more likely to have done it this time. ¶ 60 Several potential jurors raised their hands, including Juror F. Defense counsel asked Juror F why he raised his hand, and the following exchange ensued: [Juror F]: Well, where there’s smoke there’s fire. I’m an aircraft mechanic. When an aircraft has a history and it gets the same problem over and over again, you have to figure it out, and when things keep happening again, there is a problem. It’s not just a one-
time anomaly. . . . . [Defense counsel]: [F]air to say there is sort of a mechanical way to look at this issue? [Juror F]: Yeah. I mean, it depends upon the evidence presented. That is what it comes down to, that is the way I have to figure out stuff in my life, in my job. [Defense counsel]: So if you heard a rule from a judge in a criminal case in court that said you’re not allowed to use the fact that someone has done something before in any way to decide whether they have done it this time, does that make a lot of sense to you? [Juror F]: It does, but it would depend upon had the person been convicted of that before, too. 
27 [Defense counsel]: Okay. Let me ask you this. If the judge told you you could use that evidence for a specific purpose but not for deciding whether the person did it this time, does that make sense? [Juror F]: It makes sense, but, I mean, to be completely honest with you, it’s going to be in the cobwebs in the back of your mind. I think that’s just human nature. . . . . [Defense counsel]: I think a lot of people feel that way, and I fully recognize that sometimes what we lawyers ask you to do in court is inconsistent with what is normal to being a human being, if that’s fair. [Juror F]: I get it. I get it. . . . I mean, every person in this potential jury pool, I mean, they would just do the best they could to comply with the judge’s instructions. I guess that’s the way it would be. ¶ 61 Defense counsel challenged Juror F for cause, arguing that “[i]t doesn’t sound like he can unequivocally follow the [c]ourt’s [CRE] 404(b) instruction.” The court denied the challenge. ¶ 62 We review a trial court’s ruling on a for cause juror challenge for an abuse of discretion. Vigil v. People, 2019 CO 105, ¶ 14. A court abuses its discretion if its ruling is manifestly arbitrary, unreasonable, or unfair or is contrary to law. See id. 
28 ¶ 63 Defendants have a constitutional right to a fair and impartial jury, which may be violated by seating a biased juror. People v. Abu-Nantambu-El, 2019 CO 106, ¶ 14. In furtherance of that right, section 16-10-103(1)(j), C.R.S. 2024, requires a court to grant a challenge for cause to a prospective juror who “evinc[es] enmity or bias toward the defendant or the state” unless the court is “satisfied” that the prospective juror “will render an impartial verdict according to the law and the evidence submitted to the jury at the trial.” See also Abu-Nantambu-El, ¶ 16. Moreover, a prospective juror should be excused if it appears doubtful that they will be governed by the court’s instructions. Morgan v. People, 624 P.2d 1331, 1332 (Colo. 1981). ¶ 64 We conclude that the trial court didn’t abuse its discretion by denying the challenge to Juror F. The court acknowledged Juror F’s hesitation about prior act evidence but found, based on the entirety of the juror’s statements, that he could render an impartial verdict according to the law: [T]he [c]ourt did hear the statements made in regards to where there is smoke there is fire, but nonetheless the [c]ourt also heard more than that. [Juror F] said it depends on the evidence presented, . . . [which] is exactly what 
29 the [c]ourt expects. We expect the parties to consider the evidence and that it would depend on that. He is right, something [a]s vague as cobwebs in the back of my mind does not give the [c]ourt pause. I am mindful [of] what he said, but I am mindful of the totality of what he said, not just one statement or another, and his hypothetical, if you will, was somewhat rebutted when he explained that he would rely on the evidence. So it goes past 404(b). It’s actually what evidence is presented and he said that. So the [c]ourt has confidence that not only would he do his best to [do] that but that he could do that, everyone could. And he said that — he pointed to himself, too, and would do the best job they could. No one can ask any more of a juror in that scenario. ¶ 65 Thus, the court thoroughly explained why it was satisfied that Juror F could render an impartial verdict. ¶ 66 And the record supports the court’s discretionary decision. Although Juror F initially suggested that he thought evidence of prior domestic violence incidents would make it more likely that a defendant was guilty of domestic violence, he later indicated that it “depends upon the evidence presented” and, more importantly, that “every person in th[e] potential jury pool” — including himself — “would just do the best they could to comply with the judge’s instructions.” See People v. Wilson, 2014 COA 114, ¶ 11 (“A trial 
30 court abuses its discretion in this [for cause juror challenge] context only if there is no evidence in the record to support its decision.”); see also People v. Marciano, 2014 COA 92M-2, ¶ 8 (“If the potential juror indicates that she can set aside [her preconceived] beliefs and make a decision based on the evidence and the court’s instructions on the law, she may still sit on the jury.”); People v. Oliver, 2020 COA 97, ¶ 18 (“Where a potential juror states that he will try to follow the court’s instructions despite any preconceived notions, that juror may nonetheless sit on the jury.”). V. Witness Testimony ¶ 67 Lastly, Shukurov contends that the trial court erred by allowing one of the responding officers and a paramedic to comment on the victim’s truthfulness. We discern no reversible error. ¶ 68 On redirect examination of the officer, the prosecutor asked, “In your thirteen years in law enforcement, were the marks on [the victim’s] thigh consistent with being punched?” Defense counsel objected, but the court overruled the objection. The officer responded, “Yes, absolutely.” ¶ 69 Then, on redirect examination of the paramedic, the prosecutor asked, “Did anything about the visible injuries that you 
31 observed seem inconsistent with how [the victim] told you she obtained them?” Again, defense counsel objected, but the court overruled the objection. The paramedic responded, “No.” ¶ 70 According to Shukurov, by testifying that the victim’s injuries were consistent with her original allegations of domestic violence, these witnesses improperly bolstered her credibility. ¶ 71 One witness may not give opinion testimony that another witness was telling the truth on a specific occasion. People v. Wittrein, 221 P.3d 1076, 1081 (Colo. 2009); see also CRE 608. This prohibition includes indirect as well as direct implications of a witness’s truthfulness. Venalonzo v. People, 2017 CO 9, ¶ 32. ¶ 72 Shukurov acknowledges that in People v. West, a division of this court concluded that testifying that a victim’s testimony is “consistent with” certain evidence isn’t improper bolstering. 2019 COA 131, ¶¶ 37, 43. However, he urges us to depart from West because another division of this court more recently concluded that its “reasoning . . . is at odds with Colorado Supreme Court precedent.” People v. Daley, 2021 COA 85, ¶ 90 (declining to apply West); see also People v. Bobian, 2019 COA 183, ¶¶ 43-49 (Berger, J., specially concurring) (expressing disagreement with West). 
32 ¶ 73 We needn’t weigh in on the propriety of West, though, because we conclude that any error in allowing the witnesses to testify that the victim’s injuries were consistent with her statements at the scene was harmless. For the same reason, we also don’t weigh in on the People’s argument that the defense opened the door to the challenged testimony through its cross-examinations. ¶ 74 We apply the harmless error standard to determine if any preserved nonconstitutional errors in the admission of evidence warrant reversal. Venalonzo, ¶ 48. Under this standard, we reverse only if the error substantially influenced the verdict or affected the fairness of the trial proceedings. Id. ¶ 75 We conclude that any error in the admission of the challenged statements was harmless for six reasons. ¶ 76 First, the challenged statements were brief, particularly considering the total length of each witness’s testimony. The transcript of the officer’s testimony spans about eighty pages over the course of two days. The challenged portion consists of a single question and answer. Similarly, the paramedic’s testimony spans over thirty pages, but the challenged portion consists of a single question and answer. And the challenged statements weren’t 
33 directly referenced in the closing arguments. See People v. Gaffney, 769 P.2d 1081, 1088 (Colo. 1989) (erroneous admission of truthfulness testimony was harmless, in part because it consisted of a “passing remark . . . during a lengthy direct examination”); Daley, ¶ 98 (erroneous admission of testimony about the consistency of the victim’s statements was harmless, in part because it was “brief and fleeting”). ¶ 77 Second, the witnesses didn’t directly opine that the victim’s testimony was truthful or untruthful, instead saying only that her injuries were consistent with her statements on the scene. See Gaffney, 769 P.2d at 1088 (erroneous admission of truthfulness testimony was harmless, in part because it was not as direct as “the prosecuting attorney ask[ing] [an] expert witness to offer an opinion on whether a [victim] was truthful on a particular occasion”). ¶ 78 Third, both witnesses testified as lay witnesses, which further “mitigate[d] the potential power of [their] remark[s].” People v. Eppens, 979 P.2d 14, 18 (Colo. 1999) (erroneous admission of a social worker’s testimony that the victim’s statements were “sincere” didn’t rise to the level of plain error, in part because the social worker testified as a lay witness). 
34 ¶ 79 Fourth, the victim herself testified before the officer and the paramedic, which “provid[ed] the jury with a full opportunity to judge her credibility in light of her demeanor” and her prior statements. Id. (erroneous admission of truthfulness testimony didn’t amount to plain error where “[the victim] herself testified and was vigorously cross-examined prior to the [challenged testimony]”). ¶ 80 Fifth, the testimony “was not without corroboration.” Gaffney, 769 P.2d at 1089 (erroneous admission of truthfulness testimony was harmless, in part because the testimony was corroborated by physical findings and other testimony); see also Eppens, 979 P.2d at 19 (erroneous admission of truthfulness testimony didn’t amount to plain error, in part because the statements were corroborated by other evidence). Indeed, the jury heard the victim’s statements in her 911 call, saw the video of the victim’s statements at the scene, heard other witnesses recount her statements at the scene, and received photos of her injuries. The jury also heard descriptions of the injuries from other witnesses — including unchallenged testimony from one of the responding officers that a bruise on the victim’s leg appeared like “somebody’s knuckles from their hand” 
35 and that the cut on the victim’s neck was consistent with the width of the chain she was wearing at the time. ¶ 81 And sixth, the court gave the jury detailed instructions on evaluating witness credibility. The court told the jurors that they “are the sole judges of the credibility of . . . each witness . . . [and] of the weight to be given to the witness’s testimony.” It also instructed them to consider, among other things, each witness’s “knowledge, motive, state of mind, demeanor, and manner while testifying,” as well as each witness’s “ability to observe,” “the strength of [their] memory,” and “how that person obtained [their] knowledge.” This instruction further mitigated any harm that might’ve resulted from the testimony. See Gaffney, 769 P.2d at 1089 (erroneous admission of a doctor’s testimony that the victim’s statement to him was “very believable” was harmless, in part because “the trial court had cautioned the jury that it was their prerogative to determine what weight and credit to give [the victim’s] statement to the doctor”). VI. Disposition ¶ 82 The judgment is affirmed. JUDGE TOW and JUDGE KUHN concur.